KEARSE, Circuit Judge:
This opinion deals with several asbestos-litigation appeals from a final judgment of the United States District Courts for the Eastern and Southern Districts of New York, Jack B. Weinstein, District Judge of the Eastern District and sitting by designation in the Southern District, and Burton R. Lifland, Chief Bankruptcy Judge of the Southern District (collectively the “Trial Courts” or “Courts”), approving the settlement of a non-opt-out class action brought by beneficiaries of the Johns-Manville Personal Injury Trust (the “Trust”), which include persons claiming asbestos-related injuries from products manufactured by the Johns-Manville Corporation (“the Corporation” or “Manville”), as well as other manufacturers and distributors of asbestos with claims for contribution and indemnification against Manville. The consolidated appeals, Nos. 95-5004(L), -5006, -5010, and -5014, present two principal challenges. First, claimant-appellant Owens-Corning Fiberglass Corporation, suing individually and as a representative of the subclass of Codefendant Manufacturers (collectively “Codefendant Manufacturers”), along with the claimant-appellant subclass of Manville Distributors (collectively “Manville Distributors”) and intervenor-appellant Porter-Hayden Company, contend that the Trial Courts erred in failing to decide what set-off rules are to be applied to claims brought by Trust beneficiaries in Maryland. Second, plaintiffintervenor-appellant United States Fidelity and Guaranty Company (“USF & G”), an alleged insurer of a member of claimantappellee MaeArthur Subclass, contends that the settlement prejudices USF & G by creating a $10 million fund for the MaeArthur Subclass, out of which that subclass can litigate insurance claims against USF & G. In No. 95-5016, which was argued with, but is not technically consolidated with, the other appeals, elaimants-appellants Joseph F. Amato, Jr., et al., on behalf of themselves and some of the other claimants who reside in the District of Columbia, challenge the Trial Courts’ denial of their motion to opt out of the class and the settlement agreement.
For the reasons that follow, we vacate the judgment to the extent that it fails to determine what set-off rules are to be applied in Maryland cases, and we remand for resolution of that issue. In all other respects, we affirm.
I. BACKGROUND
Much of the background of the present appeals is described in our prior opinions in this litigation, familiarity with which is assumed. The Trust, created in 1988 pursuant to the bankruptcy-court-approved Second Amended and Restated Plan of Reorganization of Manville, assumed liability for all health claims brought against Manville and “Other Asbestos Obligations” of Manville. Further litigation of those claims against Manville was enjoined by the bankruptcy court in order to protect the value of Man-ville’s equity, most of which was contributed to the Trust. See Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.1988) (“Findley I”) (affirming Second Amended and Restated Plan of Reorganization). The beneficiaries of the Trust (“Trust Beneficiaries”) include (a) persons suffering, or who will in the future suffer, from asbestos-related diseases caused in whole or in part by exposure to Manville asbestos or asbestos-containing products, (b) entities formerly joined with Manville as codefendants in asbestos-related litigation, and (e) manufacturers and distributors of Manville asbestos or asbestos-containing products who have claims against Man-ville for indemnity or contribution.
When the bankruptcy court first confirmed the Manville reorganization plan, it was estimated that approximately 83,000-100,000 claims would be filed against the Trust during the course of its existence. In fact, vastly more claims (some 240,000 by December 1994) were filed. As a result of the heavy filings and the fact, inter alia, that the value of the claims filed was far greater than had been anticipated, the Trust became insolvent, leading to the commencement of the present litigation in November 1990 to restructure the Trust. The first settlement of this litigation was vacated, see In Re Joint Eastern & Southern District Asbestos Litigation, 982 F.2d 721 (2d Cir.1992), as modified, 993 F.2d 7 (2d Cir.1993) (“Findley II ”), and the matter was remanded to the Trial Courts for *770 further proceedings, including the designation of appropriate subclasses under Fed. R.Civ.P. 23 and a precise delineation of the rights accorded to codefendant manufacturers, see id. at 740.
Following our remand in Findley II, a total of six subclasses were designated. The three plaintiff subclasses are Present Claimants, Future Claimants, and Claimants with Pre-November 19, 1990 Settlements and Judgments. The three defendant subclasses are the Codefendant Manufacturers, consisting of former asbestos-product manufacturers regularly sued as codefendants with Manville or the Trust; the MacArthur Subclass, comprising the MacArthur Corporation and its affiliates Western MacArthur and Milwaukee Insulation, distributors of Man-ville products; and the Manville Distributors, representing the non-MacArthur-SubcIass distributors of asbestos-containing products manufactured by Manville.
Thereafter, amended pleadings were filed, and a trial was commenced. The trial was not completed because the parties reached a settlement on virtually all of the issues in the litigation (“the Settlement”). The proceedings are thoroughly described in the Trial Courts’ decision that is the subject of this appeal, familiarity with which is assumed. See In re Joint Eastern & Southern Districts Asbestos Litigation, 878 F.Supp. 473 (E.D.N.Y. and S.D.N.Y.1995) (“Findley III”).
A. The Settlement Agreement and the Trust Distribution Process
The Settlement Agreement provides that the rights and duties of the Trust and all class members, except as specified, are to be governed by an annexed document entitled Trust Distribution Process (“TDP”). The TDP sets forth the procedures for processing and evaluating claims against the Trust on a “first-in-first-out” basis “with the intention of paying all claimants over time as equivalent a share as possible of their claims’ values.” (TDP at 1.) Toward this goal, the TDP designates seven asbestos-related disease categories and assigns a value to claims brought against the Trust for each of those categories of illness. Once a liquidated value is assigned to a claim, the claimant is entitled to receive a pro rata share of its value based on a percentage set by the Trust in consultation with various advisers. The initial share was set at 10% of the claims’ value. The Trust is to reevaluate its assets and expected liabilities at least every three years to determine whether the pro rata share should be adjusted. A decrease in share is not to affect past payments; but if the share is increased, the Trust must equalize payments made to claimants who previously received a lower pro rata share of the value of their claims.
The TDP preserves the rights of claimants to obtain individual assessments of the value of their claims. Any unresolved dispute about the value of a claim is subject to arbitration, and if the dispute is not resolved by the arbitrator, the claimant may pursue a tort suit against the Trust. However, the TDP provides limitations as to the amounts and timing of payments by the Trust pursuant to judgments recovered in such suits. The bankruptcy court's original injunction against present and future litigation by claimants against Manville itself remains intact, and all Trust Beneficiaries are allowed to pursue their claims against the Trust only as provided in the TDP.
The TDP provides set-off and contribution rules governing codefendant claims against the Trust. The Trust is to be treated in litigation as a legally responsible tortfeasor without the introduction of additional proof; it is not to be treated as a bankrupt entity unless formal bankruptcy proceedings are commenced by or against the Trust and applicable law permits the treatment of the Trust as a bankrupt. Codefendants retain a right to partial reimbursement from the Trust through set-off or contribution in certain circumstances. In general, the TDP refers to local law for the calculation of the set-off, recognizing different rules in three categories of states: pro tanto states, in which the judgment against nonsettling defendants is reduced by the amount paid or agreed to be paid by a released party; pro rata states, in which the total liability is divided equally among all defendants held to be legally responsible tortfeasors, and the *771 judgment is reduced by a released party’s pro rata share of liability; and apportionment states, in which liability is apportioned by the factfinder among those found to be tortfeasors, and the amount of the judgment is to be reduced with reference to the apportioned share of a released or absent tortfeasor. See TDP § H.3.
With respect to suits brought in pro rata and pro tanto states, the TDP alters state set-off rules by indemnifying the Trust against contribution claims arising from judgments obtained by health claimants, if a set-off credit is awarded by the trial court in accordance with the TDP and local law. The TDP also permits a codefendant to elect to obtain a set-off according to state rules even where the claimant has not settled with the Trust. Alternatively, a codefendant may relinquish its right to a set-off credit and pay the full judgment, thereby preserving its right to pursue a contribution claim against the Trust.
With respect to suits in apportionment states, the TDP modifies the set-off rules by permitting a plaintiff to agree not to pursue his or her claim against the Trust in order to seek full compensation from the Trust’s eodefendants. TDP § H.3(d)(ii)(B). If a codefendant pays the entire resulting judgment or enters into a postverdiet or postjudgment settlement with the claimant, that codefendant retains the right, by means of a contribution claim, to recover from the Trust a portion of the payment that is attributable to the Trust’s liability.
The Settlement Agreement also required the Trust to establish a separate $10 million fund for the MacArthur Subclass (“MacArthur Fund”), in exchange for a release by members of that subclass of claims against Manville or the Trust. The purpose of this fund is to reimburse MacArthur Subclass members for legal fees incurred (a) in litigation against its current or former insurers, or (b) in defense of lawsuits or settlements of claims brought against it for personal injuries caused by exposure to Manville asbestos or asbestos-containing products. With respect to the latter, the MacArthur Subclass is entitled to seek reimbursement from the MacArthur Fund only after all available insurance coverage has been exhausted. If the subclass recovers $20 million or more from its insurers, its rights to the MacArthur Fund revert to the Trust.
The Settlement Agreement left one issue unresolved. Those plaintiffs who resided in Maryland (“Maryland Plaintiffs”) contended that the set-off provisions of the TDP dealt with them in a way that Maryland law did not permit and treated them unfairly in comparison to residents of some other states. Accordingly, the parties agreed that the TDP’s set-off provisions would be inapplicable to asbestos health claims arising under Maryland law and that the question of what set-off rules were to be applied to those claims would be submitted to the Trial Courts:
The parties consent to trial by the [Trial] Courts of the issue of appropriate set-off rules that should be developed with respect to Manville or the Trust in connection with claims arising under Maryland law in the context of a fair and adequate resolution of these proceedings.
(Settlement Agreement at 9.) As discussed in greater detail in Parts I.C. and II.A. below, this issue was the subject of a short trial in August 1994.
B. Objections to the Settlement; the Trial Courts’ Rulings
In addition to the question of Maryland set-off rules, submitted to them by the parties’ Settlement Agreement, the Trial Courts were presented with two objections that are pertinent to the present appeals. First, as set forth in greater detail in Part II.B. below, some 150 claimants who had filed or intended to file claims in the District of Columbia (the “D.C. Plaintiffs”) moved to opt out of the plaintiff class on the ground that the TDP would limit the settlement amounts they received from the Trust to 10% of the value assigned to their claims, while District of Columbia law would require that a judgment against a codefendant be reduced by the Trust’s full pro rata share of the verdict. Second, as set forth in greater detail in Part II.C. below, USF & G, which had denied any obligation to pay asbestos-related claims of any member of the MacArthur Subclass, *772 moved to intervene and objected to so much of the Settlement Agreement as required the creation of the MacArthur Fund. USF & G argued that that fund would give the MacArthur Subclass an unfair advantage in litigating insurance coverage claims against USF & G.
After holding fairness hearings on the proposed Settlement in November 1994, issuing a preliminary decision approving the Settlement in December 1994 (“December 15 Memorandum”), circulating the December 15 Memorandum widely to all parties and attorneys representing Trust claimants, and hearing oral arguments in January 1995 on various proposed amendments to the December 15 Memorandum, the Trial Courts issued their final decision, i.e., Findley III, in an Amended Memorandum, Orders and Final Judgment dated January 19, 1995 (“Amended Memorandum”). The plaintiff class was certified to include
[a]ll past, present and future Beneficiaries of the Manville Personal Injury Settlement Trust each of whom has or will have a claim either for wrongful death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of death or personal injury claims.
Findley III, 878 F.Supp. at 575. The D.C. Plaintiffs’ motion to opt out was denied. The Trial Courts held that because the Settlement had been negotiated in the context of a non-opt-out class action under Fed.R.Civ.P. 23(b)(1)(B), it binds all parties to the action and that to permit one group to opt out in the absence of special circumstances would destroy the delicate balances and fairness created by the Settlement. The Courts concluded that no special circumstances warranted exercise of the Courts’ discretionary authority to grant the D.C. Plaintiffs leave to opt out.
As to USF & G, the Trial Courts stated that the insurer might have, at best, a potential future right to subrogation or indemnity from the Trust; but they concluded that as an insurer denying coverage to defendants on asbestos-related claims, USF & G lacked sufficient interest in the outcome of the present Trust-restructuring litigation to permit it to block a reasonable settlement. Accordingly, the Courts granted USF & G’s motion to intervene but rejected its challenge to the establishment of the MacArthur Fund.
C. The Maryland Set-Off Issue
With respect to the issue of what set-off rules would apply to the claims of plaintiff class members residing in Maryland, the Trial Courts held a trial prior to approval of the Settlement. At that trial, there was evidence that the Maryland set-off statute creates a right of contribution among two or more joint tortfeasors once one joint tortfeasor has discharged the common liability or paid more than its pro rata share of the judgment. There was evidence that the recovery of a judgment by the injured person against one joint tortfeasor does not discharge other joint tortfeasors from liability for the amount of the settlement unless the plaintiff executed a release so providing. In the latter event, the claim against the other joint tortfeasors is reduced by the amount of consideration paid for the release, or by a greater amount if the release so provides. Three types of such releases are in use: (1) a pro tanto release, which provides a set-off against liability in an amount equal to the consideration paid for the release if the settling party is found to be a joint tortfeasor; (2) a conditional pro rata release, which permits a set-off for the amount of the settling party’s pro rata share of the judgment if the settling party is found to be a joint tortfeasor, see Swigert v. Welk, 213 Md. 613, 133 A.2d 428 (1957); and (3) an unconditional pro rata release, which provides for a pro rata set-off against the judgment regardless of whether the settling defendant is found to be a joint tortfeasor, see Jones v. Hurst, 54 Md.App. 607, 459 A.2d 219 (Ct.Spec.App.1983). One of the Maryland Plaintiffs’ attorneys testified that the amount of the settlement would control the type of release given: where the settling tortfeasor pays an amount that is close to its pro rata share, the plaintiff will likely provide one of the two forms of a pro rata release; if the amount paid is significantly less than the pro rata share, the plaintiff will likely be willing to give only a pro tanto release.
*773 The controversy for the Trial Courts centered on what type of release could be obtained by the Trust. The Maryland Plaintiffs’ witness suggested that health claimants who obtained from the Trust only 10% of the value of their claims would be reluctant to execute a pro rata release of liability since the 10% received from the Trust would most likely represent significantly less than the Trust’s pro rata share of liability. On the other hand, a witness for the Codefendant Manufacturers testified that the ability to obtain a pro rata release would be affected by a variety of factors, including plaintiffs’ estimation of their ability to prove that it was Manville that to some extent had caused their asbestos-related injuries; the witness said it was typical in asbestos eases for a large gap to exist between the settlement amount and the settling tortfeasor’s pro rata share of liability. Both sides submitted post-trial briefs to the Trial Courts, advancing proposals for an equitable compromise to resolve the Maryland set-off dispute, and urging the Trial Courts to adopt a standard set-off principle to be applicable to claims of the Maryland Plaintiffs.
In the Amended Memorandum, the Trial Courts decided that Maryland law in general would apply, but they reached no conclusion as to which of Maryland’s various set-off rules would be applied to the asbestos-related claims involved in this class action. Noting that while Maryland’s contribution rules generally provide for pro tanto reductions in the absence of a release signed by plaintiff permitting reduction by another amount, the Courts observed that
[ujnder Maryland law as it was conceived to operate through contribution actions, when all the dust has cleared each defendant should only be out of pocket to the extent of its pro rata share, and the plaintiff should have received the full amount of his or her judgment from the responsible tortfeasors.
Id. at 551. The Trial Courts stated that “the assumption that non-settling eodefendants can seek contribution from settling defendants appears to underlie the statutory scheme,” id.; the Courts reasoned that in the present circumstances, “where no contribution substantially over 10% of matrix values is ordinarily available from the Trust,” the Maryland set-off scheme “is subverted,” id. They concluded that “[i]t is not clear how the Maryland courts would treat a settling defendant such as the Manville Trust which stipulates to tortfeasor status ... but is unable to pay substantially for plaintiffs’ damages, except possibly (but almost inconceivably) over the very long haul.” Id. at 550. The Courts stated that to treat the Trust as a pro tanto releasee would force a codefendant to shoulder a larger share of the judgment than may be intended by Maryland law. See id. at 551-52. On the other hand, if the Trust were treated as a pro rata settlor, plaintiffs would remain uncompensated for the difference between the Trust’s pro rata share of liability and the dollar amount paid for the release.
Deeming “Maryland’s policy interests in preserving the balances struck by its unique statutory and case law scheme between plaintiff’s right to full recovery and defendant’s right to an equitable offset for other parties’ culpable conduct [to be] paramount,” id. at 547-48, the Trial Courts declined either to accept any of the compromise proposals suggested by the parties or to fashion any rule of their own. Acknowledging that they possessed the power to vary the set-off rules established by Maryland law, see id. at 553, the Trial Courts declined to do so in “deference to state courts,” id. at 481, and instead ordered that the issue be left to resolution by the courts of Maryland. The question was not one of power, they stated, “but of prudence.” Id. at 553. They stated that
[i]t is not apparent what Maryland law is. It is unclear whether Maryland would fashion its law in the form of its statutes read literally, or in equity, or in some amalgam of both sources, and it is not apparent what the result would be under any of the myriad possible approaches. Prudence dictates leaving the issue for Maryland courts to resolve, either on a ease-by-case basis, by some form of declaratory judgment, or by amendment to Maryland statutes.
Id. at 556.
Mindful of this Court’s direction in Findley II that “whatever provisions may ultimately *774 be ordered respecting [codefendant manufacturer’s] rights ... must be spelled out in the operative language of the Trial Courts’ judgment,” Findley II, 982 F.2d at 740, the Trial Courts concluded that allowing the Maryland courts to determine which set-off rules were to be applied on a ease-by-ease basis was sufficient:
Sufficient precision is provided by allowing the Maryland courts to apply Maryland law and equity, in light of the facts that: 1) plaintiffs settled with the Trust for the full amount of any Manville share of a recovery and can be considered, for purposes of computation of liability and rights of codefendants, to have received a promise from the Trust to pay that full amount as and if funds become available; 2) plaintiffs will immediately receive, under the Courts’ present orders, 10% of the scheduled amounts. They have the opportunity to receive from the Trust future payments of the additional 90% without interest in the unlikely event that claims are much less than predicted and the value of the Trust corpus much greater. It is highly unlikely that Maryland Plaintiffs will receive much more than 10%, and that in the distant future; and 3) the Trust is prohibited from defending any case in the Maryland courts in order to prevent further dissipation of its limited funds.
Findley III, 878 F.Supp. at 556.
Judgment was entered leaving the decision of which Maryland set-off rules would apply undecided, but otherwise approving the Settlement and the TDP as fair, adequate, and reasonable. These appeals, along with two others decided this day by summary order, see In re Joint Eastern & Southern District Asbestos Litigation (O’Malley), 1996 WL 77954 and In re Joint Eastern & Southern District Asbestos Litigation (Saunders), 1996 WL 75879, followed.
II. DISCUSSION
On the present appeals, the issues presented are whether the Trial Courts erred in (1) deferring to the Maryland courts for decisions as to what set-off rules are to be applied to Trust Beneficiaries’ health claims brought under Maryland law, (2) denying the D.C. plaintiffs permission to opt out; and (3) approving creation of the MacArthur Fund. We find error only in the Trial Courts’ refusal to decide which set-off rules are to be applied in Maryland cases.
A. Abstention on the Maryland Set-Off Issue
At the outset, we note our rejection of the appellate position of the Maryland Plaintiffs that the Trial Courts did not in fact abstain from deciding an issue but merely granted them the relief they had sought by simply deciding that Maryland law applies. The question presented to the Trial Courts was not whether Maryland law would apply to Maryland cases but was rather which of the various Maryland contribution and set-off rules should be used. The Settlement Agreement itself specifically required the Trial Courts to choose “the appropriate set-off rules that should be developed with respect to Manville or the Trust in connection with claims arising under Maryland law.” (Settlement Agreement at 9.) The Maryland Plaintiffs argued below that since Maryland generally provides that, in the absence of a contrary agreement by the plaintiff, judgments against nonsettling parties are to be reduced only by the amount of consideration in fact paid for the release, the Trial Courts should order that Maryland be treated as a pro tanto state. The Codefendant Manufacturers and the Manville Distributors argued that since Maryland also permits pro rata releases and it had been the Trust’s practice to receive pro rata releases, Maryland should be treated as a pro rata state. The Trial Courts recognized this dispute in their Amended Memorandum:
The Plaintiff Class and Maryland Plaintiffs believe that Codefendants and Distributors should bear any shortfall between Man-ville’s pro rata share and what plaintiffs in fact receive from the Trust. The Codefendants and the Distributors assert that, under Maryland law, the plaintiffs would bear the full burden.
Findley III, 878 F.Supp. at 550-51.
In dealing with the issue, the Trial Courts stated that their decision to leave the issue *775 for resolution by the Maryland courts was an act of “[pjrudenee,” id. at 556, motivated by “deference to state courts” on state-law questions, id. at 481. We conclude that by refusing to resolve the disagreement as to which Maryland principles should be applied in the context of the Settlement and the TDP, the Trial Courts abstained from deciding the issue left unresolved by the Settlement.
We also conclude that abstention was inappropriate. The abstention doctrine comprises four “extraordinary and narrow exception[s]” to a federal court’s duty to exercise jurisdiction. Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (“Colorado River”) (internal quotation marks omitted); see also Bethphage Lutheran Service, Inc. v. Weicker, 965 F.2d 1239, 1242 & n. 2 (2d Cir.1992). Except in actions for declaratory judgment, in which a court has broader discretion to abstain, see generally Wilton v. Seven Falls Co., — U.S. -,-, 115 S.Ct. 2137, 2144, 132 L.Ed.2d 214 (1995), a district court’s decision to abstain is appropriate only in order (1) to avoid a federal constitutional issue where that issue may be mooted or altered by a state-court ruling on the state-law question, see Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); or (2) to avoid hindrance of such state functions as criminal prosecutions or the collection of state taxes, see Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); or (3) to conserve federal judicial resources in those “exceptional circumstances” where there is concurrent state-court litigation whose resolution could result in “comprehensive disposition of litigation,” Colorado River, 424 U.S. at 813, 817, 96 S.Ct. at 1244, 1246 (internal quotation marks omitted); or (4) to defer to state resolution of difficult state-law questions that involve local regulation and administration or important matters of local public policy, see, e.g., Kaiser Steel Corp. v. W.S. Ranch Co., 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968) (per curiam); Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). But for these excepted areas, the federal courts have a “virtually unflagging obligation ... to exercise the jurisdiction given them.” Colorado River, 424 U.S. at 817, 96 S.Ct. at 1246.
Although the standard of review of a district court’s decision to abstain is often described as an abuse-of-diseretion standard, see, e.g., Bethphage Lutheran Service, Inc. v. Weicker, 965 F.2d at 1244, we have noted that in the abstention area that standard of “review is somewhat rigorous,” id. Because “we are considering an exception to a court’s normal duty to adjudicate a controversy properly before it,” the district court’s “ ‘discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved.... Thus, ... there is little or no discretion to abstain in a ease which does not meet traditional abstention requirements.’” Id. at 1244-45 (quoting Mobil Oil Corp. v. City of Long Beach, 772 F.2d 534, 540 (9th Cir.1985) (inner internal quotation marks omitted)). “The underlying legal questions ... are subject to plenary review.” Sheerbonnet, Ltd. v. American Express Bank Ltd., 17 F.3d 46, 48 (2d Cir.), cert. denied, — U.S. -, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994).
In the present case, the only potentially applicable abstention category was the fourth listed above, commonly referred to as Burford abstention, as to which a federal district court may properly decline to decide difficult questions of state law bearing on substantial public policy matters whose importance transcends the result in any particular ease. For example, in Burford v. Sun Oil Co., the Supreme Court ruled that abstention was appropriate because federal review of an order of the Texas Railroad Commission would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial state concern, to wit, the conservation of oil and gas in Texas. See 319 U.S. at 327, 63 S.Ct. at 1104. In Louisiana Power & Light Co. v. City of Thibodaux, the Supreme Court affirmed the decision of the district court to stay federal proceedings to allow Louisiana’s highest court an opportunity to rule on a disputed question as to the meaning of a state statute governing the *776 state’s power of eminent domain. The Court reasoned that such a stay was warranted by the “special and peculiar nature” of eminent domain proceedings. 360 U.S. at 28, 79 S.Ct. at 1072. Abstention in that case “avoid[ed] the hazards of serious disruption by federal courts of state government or needless friction between state and federal authorities” that could arise when a federal court decided issues that “normally turn on legislation with much local variation interpreted in local settings.” Id. Similarly, in Kaiser Steel Corp. v. W.S. Ranch Co., the Court held that “[s]ound judicial administration require[d]” abstention where a state-law water-use issue was of vital concern to the state, and a declaratory judgment action was pending in state court. 391 U.S. at 594, 88 S.Ct. at 1754. See also Corcoran v. Ardra Insurance Co., 842 F.2d 31, 37 (2d Cir.1988) (abstention appropriate where there is a novel question implicating a state’s complex administrative and judicial system for regulating and liquidating domestic insurance companies).
We cannot see a valid ground for Burford abstention in the present case, for we have been pointed to no area of state regulation or local public policy whose importance would transcend that of any given asbestos-related settlement. States commonly have a policy interest in seeing both that all claimants are fully compensated for injuries caused them by tortfeasors and that all tortfeasors bear their fair share of the expense of satisfying those claims. The Trial Courts did not suggest that any special policy or state regulatory system would be affected by their resolution as to which of Maryland’s set-off rules should be applied in connection with this Settlement. They cited only the fact that state law is unclear where achievement of the ideal resolution is prevented by one tortfeasor’s bankruptcy. Nonetheless, where the state law whose interpretation in such common matters is unclear, difficulty of decision is an insufficient ground for federal abstention. As the Supreme Court observed in Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943),
diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts. In the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred ... it has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment.
Id. at 234, 64 S.Ct. at 10. If mere difficulty of decision is not a ground for abstention where the district court’s subject matter jurisdiction is based solely on diversity of citizenship, far less can it be a ground for abstention where, as here, jurisdiction is also based on the bankruptcy laws.
"Where none of the abstention exceptions is applicable, if the highest court of the state has yet to rule on a controlling question of state law, or if the application of state law is uncertain, it is the task of the federal court “to carefully ... predict how the highest court of the forum state would resolve the -uncertainty.” Bensmiller v. E.I. DuPont de Nemours & Co., 47 F.3d 79, 82 (2d Cir.1995) (internal quotation marks omitted); see also Travelers Insurance Co. v. 633 Third Associates, 14 F.3d 114, 119 (2d Cir.1994); Calvin Klein, Ltd. v. Trylon Trucking Corp., 892 F.2d 191, 195 (2d Cir.1989). The district court faced with unclear state law is required to “determine what it believes [the] state’s highest court would find if the issue were before it,” Plummer v. Lederle Laboratories, 819 F.2d 349, 355 (2d Cir.) cert. denied, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), and to apply that determination to the facts of the federal proceeding.
In sum, a district court may not properly abstain merely because the state-law question is difficult or the answer is uncertain. We conclude that the Trial Courts abused their discretion in abstaining from deciding how Maryland set-off principles are to be applied in the context of the present Settlement. We therefore remand to the district courts for a determination of that issue.
In remanding, while we express no ultimate opinion as to the proper resolution of *777 how Maryland’s statutory scheme should be applied to the claims against the Trust, we are constrained to note our disagreement with the Manville Distributors’ contention that Maryland law would clearly require a pro rata release where a plaintiff settles with a joint tortfeasor that is unable to pay its full share of contribution. Under the Maryland Uniform Contribution Among Tort-Feasors Act, Md.Ann.Code art. 50, §§ 16-24 (1957) (“Uniform Act”), a nonsettling joint tortfeasor is entitled to contribution from a settling joint tortfeasor when the nonsettling party has paid more than its pro rata share of the judgment. See id. § 17. However, the statute also provides that unless a release given by an injured party upon settlement with one joint tortfeasor provides for a reduction in an amount greater than the consideration paid, the release “reduces the claim against the other tort-feasors in the amount of the consideration paid for the release.” Id. § 19 (emphasis added). While the Manville Distributors are thus correct that the “primary purpose [of the Uniform Act] was to create a right of contribution among joint tortfeasors, which did not exist at common law,” Collier v. Eagle-Picher Industries, Inc., 86 Md.App. 38, 56, 585 A.2d 256, 265 (Ct.Spec.App.), cert. denied, 323 Md. 33, 591 A.2d 249 (1991) (internal quotation marks omitted), the plain language of the statute provides only for a pro tanto reduction in liability in the absence of an express agreement to the contrary. Whether and to what extent in Maryland cases it is the plaintiff or the defendant who will be required to bear the shortfall due to the Trust’s limited assets is unclear but must be resolved by the Trial Courts on remand.
B. The D.C. Opt-Out Issue
The D.C. Plaintiffs represent approximately 150 of the more than 300 health claimants who have filed or will file claims for asbestos-related injuries in the District of Columbia. The law of that jurisdiction subjects joint tortfeasors to joint and several liability. Thus, if a plaintiff has not settled with any of the defendants, he is entitled to recover in full from any or all against whom a judgment is entered. If he has settled with a defendant, however, that settlement will lead to a reduction in any judgment against the remaining defendants. If the settling defendant is determined to be a joint tortfeasor, the reduction will be pro rata; if there is no such determination, the reduction will be pro tanto. Because under the Settlement Agreement the Trust is deemed to be a settling joint tortfeasor, any judgment a Trust beneficiary health claimant obtains in the District of Columbia against defendants other than the Trust will be reduced pro rata. The D.C. Plaintiffs prefer not to be bound by the Settlement because it will cost them the opportunity under District of Columbia law to recover fully from defendants other than the Trust. They contend principally, relying on Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (“Shutts ”), that considerations of due process require that they be allowed to opt out of the Plaintiff Class. We conclude that the Trial Courts properly denied the motion to opt out.
In Shutts, the Supreme Court considered a class action that purported to adjudicate the royalty rights of a number of persons who lacked the requisite contacts with the forum state to give the state court personal jurisdiction over them. The Shutts Court stated that “due process requires at a minimum that an absent plaintiff [in a class action] be provided with an opportunity to remove himself from the class by executing and returning an ‘opt out’ or ‘request for exclusion’ form to the court.” Id. at 812, 105 S.Ct. at 2974. The Court limited its ruling, however, “to those class actions which seek to bind known plaintiffs concerning claims wholly or predominantly for money judgments,” and it expressly declined to state a view concerning “other types of class actions, such as those seeking equitable relief.” Id. at 811 n. 3, 105 S.Ct. at 2974 n. 3.
In Findley II, we rejected a Shutts-based jurisdictional challenge similar to the D.C. Plaintiffs’ contention on this appeal. We pointed out two significant differences between this case and Shutts. First, we noted that the present action, though it ultimately will affect the amount of damages that each member of the plaintiff class will be entitled to receive, is not an action for money damages but is rather an action in equity for the *778 restructuring of the Trust. Findley II, 982 F.2d at 735. Thus, the holding in Shutts did not extend to this action.
Second, we noted this Court’s ruling in In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir.1992) (“Drexel ”), cert. dismissed, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993), that the Shutts holding as to what due process requires where a court lacks personal jurisdiction over some class members does not apply where the court has an independent basis for jurisdiction, see 960 F.2d at 292. In Findley II, we found that, for this reason as well, Shutts did not apply to the present action,
agree[ing] with the appellees and with the Trial Courts that in rem and quasi in rem jurisdiction is available.... The Trial Courts are fully entitled to exereise jurisdiction over the beneficiaries of a trust created in New York, pursuant to the authority of a Southern District bankruptcy court.
Findley II, 982 F.2d at 735.
Accordingly, in Findley II, we concluded that the question of whether a given group of plaintiffs should be allowed to opt out of a settlement of this litigation would depend on whether they received the protections accorded by Fed.R.Civ.P. 23. If the procedural requirements of that Rule were satisfied, the Trial Courts would be entitled to approve a settlement “over the objection of those who were denied the opportunity to opt out of the class.” Findley II, 982 F.2d at 735. We were
not persuaded that the need to insist on bankruptcy law protections is greater in this case than it was in Drexel, and the reasonableness of using a [Rule 23](b)(l)(B) non-opt-out class is at least as compelling in this ease as in Drexel.
We are ... willing to permit the use of [a non-opt-out] class action in the pending ease, so long as there exists ... appropriate designation of subclasses to provide assurance that the consent of groups of claimants who are being treated differently by the settlement is being given by those who fairly and adequately represent only the members of each group.
Findley II, 982 F.2d at 739.
Accordingly, the Trial Courts were not required to allow the D.C. Plaintiffs to opt out, so long as their rights were fairly and adequately represented.
Though the D.C. Plaintiffs contend that their rights were not so represented, we disagree. Under Rule 23, the district court may not properly certify an action as a class action unless it is satisfied that, inter alia, the representative plaintiffs “will fairly and adequately protect the interests of the class.” Fed.R.Civ.P. 23(a)(4). To be fair and adequate, representation must meet two basic standards under Rule 23:
First, class counsel must be qualified, experienced and generally able to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another.
Drexel, 960 F.2d at 291 (internal quotation marks omitted). Even where the requirements of Rule 23 have been met, the district court retains some discretion to “allow a class member to opt out of a limited fund class action ... in order to facilitate the fair and efficient conduct of the action.” County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1304-05 (2d Cir.1990) (internal quotation marks omitted).
In the present case, the D.C. Plaintiffs have not suggested that counsel or the class representatives lacked the requisite qualifications to represent them in particular or the Plaintiff Class in general, or that class counsel neglected their duties toward their clients. Nor does the record suggest that any such contention would be meritorious. The record demonstrates that the interests of the D.C. Plaintiffs as members of the subclass of present claimants were vigorously defended before the Trial Courts by attorneys who were experienced in mass tort litigation. And there is no indication that the claims of the D.C. Plaintiffs are antagonistic to the claims of any other class member. Indeed, there are a greater number of identically situated class members, i.e., other health claimants suing in the District of Co *779 lumbia, who do not seek to opt out. Nor have the D.C. Plaintiffs indicated any way in which their claims are distinguishable from those of the thousands of health claimants residing in other pro rata jurisdictions, or any way in which the Settlement treats them differently from those claimants.
Instead, the D.C. Plaintiffs argue that since the TDP allows health claimants in apportionment states to forgo their claims against the Trust in order to seek full compensation from the Trust’s codefendants, the TDP gives all health claimants who reside in •pro rata jurisdictions less favorable treatment. This difference in treatment, however, was supported by evidence that the Trust’s share of liability in apportionment states is likely to be twice as high as its share of liability in pro rata jurisdictions. It was not an abuse of discretion for the Trial Courts to view that factor as a reason for approving the TDP’s proposed different treatments of health claimants in the different categories of states in order to facilitate a fair and efficient reorganization of the Trust.
The Trial Courts found no special circumstances justifying the D.C. Plaintiffs’ motion to opt out, and they concluded that the Settlement was a fair one founded on a delicate balancing of interests, and that the balance would be upset by permitting the D.C. Plaintiffs to opt out. Given these considerations, and given that the record indicates that the D.C. Plaintiffs received fair and adequate representation of their rights, we conclude that the Trial Courts’ denial of their motion to opt out was not an abuse of discretion.
C. The USF &G Issue
USF & G, claiming to be a trust beneficiary because Western MacArthur has asserted insurance claims against it and because the notice of the settlement of the litigation stated that the Settlement would govern the benefits of “[a]ll persons or entities who now have, or in the future may have, a claim for ... indemnification ... arising from any obligation of the Trust for the payment of a death or personal injury claim” (USF & G brief on appeal at 22 (emphasis in brief)), contends principally that the Trial Courts should have disapproved or restructured the Settlement on the grounds that (1) the creation of the MacArthur Fund was a misallocation of Trust assets that should be used to satisfy claims of health claimants rather than to provide a war chest for Western MacArthur’s insurance claims against USF & G, (2) USF & G was not adequately represented by the MacArthur Subclass in the Settlement negotiations, and (3) the refusal to treat USF & G as a claimant creates the risk of future disruption of the Trust’s administration, for USF & G will not be barred from asserting its claims against the Trust in the future. We reject all of these arguments, and we dismiss USF & G’s appeal for lack of standing.
An intervenor in an action has standing to appeal only if it has “suffered an injury in fact that is fairly traceable to the challenged action and that is likely to be redressed by the relief requested.” Schulz v. Williams, 44 F.3d 48, 52 (2d Cir.1994). To suffer an “injury in fact,” an intervenor must have more than an “abstract concern” or “a mere interest in the problem.” Diamond v. Charles, 476 U.S. 54, 67, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986) (internal quotation marks omitted). Rather, it must have experienced “an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 559, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). The party seeking to appeal must have a “direct stake in the outcome of a litigation,” Schulz v. Williams, 44 F.3d at 52 (internal quotation marks omitted), such that it is “likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision,” Lujan v. Defenders of Wildlife, 504 U.S. at 559, 112 S.Ct. at 2136 (internal quotation marks omitted).
Two sets of principles form the basis of our conclusion that USF & G has no such interest in the present matter. First, “[a]n insurer who has not paid its insured’s claim has no right in claims which the insured has against third parties.” Bunge Corp. v. London & Overseas Insurance Co., 394 F.2d 496, 497 (2d Cir.), cert. denied, 393 *780 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). While the insurer may have a future interest in the rights that its insured has against a third party, the insurer’s right of subrogation comes into existence only when the insurer pays the claim of the insured. See Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 309 (2d Cir.1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); Bunge Corp. v. London & Overseas Insurance Co., 394 F.2d at 497. Second, when an insurer has denied coverage, the person claiming coverage may enter into a settlement with a third party without first litigating its coverage dispute with the insurer and without prejudice to its right to pursue the coverage claim against the insurer; and the insurance claimant’s execution of a release in favor of the third party, which extinguishes any present or future rights it might have against the third party, thereby also eliminates any subrogation right of the insurer to recover against the third party. See, e.g., Bunge Corp. v. London & Overseas Insurance Co., 394 F.2d at 497 (“even if [the insurer] were now to pay [the insured] in full, it would succeed to no rights against [the third party]”).
In the present case, it is clear that USF & G has no present concrete interest of its own in the outcome of this litigation. It is neither a health claimant nor a purveyor of asbestos products; any interest it may have in the Settlement derives only from its potential obligation to insure Western MacArthur, a party-defendant to the ' class action. But USF & G has not paid Western MacArthur’s insurance claims, and, under the above principles, USF & G therefore has no present interest in any claims that Western MacArthur might have against the Trust. Further, since USF & G has denied that it has any obligation to pay asbestos-related claims of any member of the MacArthur Subclass, Western MacArthur had the right to release its claims against the Trust. Western MacArthur exercised that right, and thus, whatever the outcome of the coverage dispute between USF & G and Western MacArthur, USF & G will have no right of indemnification against the Trust in the future.
USF & G’s reliance on cases such as Ingersoll Milling Machine Co. v. M/V Bodena and St. Paul Fire & Marine Insurance Co. v. United States Lines Co., 258 F.2d 374 (2d Cir.1958), cert. denied, 359 U.S. 910, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959), for the proposition that if it is obligated to provide coverage it will retain the right to indemnification from the Trust after it unsuccessfully litigates those coverage questions, is misplaced, for it ignores the distinction between the cited cases and this one. In those cases, unlike this one, the insured had not given a release to the party from whom the insurer would seek indemnification.
We conclude that since USF & G has denied any insurance obligation to Western MacArthur, USF & G has no cognizable present interest in the litigation, and that since Western MacArthur has permissibly given a release to the Trust, USF & G has no cognizable future interest in indemnification from the Trust in the event that Western MaeArthur’s claim of coverage is upheld. Accordingly, we dismiss USF & G’s appeal for lack of standing to challenge the Settlement.
CONCLUSION
For the reasons stated above, the judgment of the Trial Courts deferring to the Maryland state courts on the question of which Maryland set-off rules are to be used in the context of the TDP is vacated, and the matter is remanded for resolution of that issue. The appeal of USF & G is dismissed for lack of standing. In all other respects, the judgment of the district courts is affirmed.